**Page 1**

```
        IN THE UNITED STATES DISTRICT COURT
        FOR THE WESTERN DISTRICT OF WISCONSIN
_____

RONALD G. WOLFF, JR., and
KARRI E. WOLFF,

            Plaintiffs,
                                Case No. 22-cv-177-wmc
vs.

ADMINISTRATOR TINA RENEE VIRGIL,
in her official capacity, and
SPECIAL AGENT JAY YERGES, in his
personal and official capacity,

            Defendants.
_____

              DEPOSITION OF JAY YERGES
_____


        Deposition of JAY YERGES, taken before
me via videoconference, on the 30th day of June,
2023, A.D., otherwise than as a witness on the
trial, in a certain action now pending in United
States District Court for the Western District of
Wisconsin, wherein the parties thereto are as set
forth above.



                    - - - - - -




              Jessica Koepsell, RPR, CRR
```

**Page 2**

```
                     APPEARANCES

        APEX ACCIDENT ATTORNEYS, LLC, of
    Oshkosh, Wisconsin; MR. GEORGE W. CURTIS of
    that firm appeared via videoconference on
    behalf of the Plaintiffs.

        EMINENT DOMAIN SERVICES, LLC, of
    Madison, Wisconsin; MR. ERIK OLSEN of that
    firm appeared via videoconference on behalf
    of the Plaintiffs.

        STATE OF WISCONSIN, DEPARTMENT OF
    JUSTICE, of Madison, Wisconsin;
    MS. GESINA S. CARSON of that firm appeared
    via videoconference on behalf of the
    Defendants.


                    - - - - - -


                  INDEX TO EXHIBITS
EXHIBIT NUMBER                            PAGE MARKED

                   (None Marked.)


                    - - - - - -
```

**Page 3**

    Said JAY YERGES, having been first
duly sworn by me to testify the truth, the
whole truth, and nothing but the truth
relative to said cause, in answer to oral
interrogatories, deposed and made answer as
follows:
                - - - - - - -
    (The examination began at 10:10 a.m.
on June 30, 2023.)
                - - - - - - -
                EXAMINATION
BY MR. OLSEN:
Q   Special Agent Yerges, thanks for being here
    today.  You understand we're here to talk
    about a case involving a search that took
    place on March 22nd of 2022, correct?
A   Yes.
Q   You've been deposed many times before,
    correct, I'm sure?
A   Deposed, not many times but deposed.
Q   Okay.  The basic premise is that I'll ask
    questions.  Your attorney may object.  If
    you don't understand something I'm asking,
    please ask for clarification because
    otherwise later on we might have a problem

**Page 4**

    because you would have responded to
    something in a way that you didn't
    understand.  Is that fair enough?
A   Fair.
Q   First, I would like to ask you about the
    pre-search meeting that was held at the
    Appleton field office on March 22nd of 2022.
    Do you remember that meeting?
A   Yes.
Q   Who was in charge of that meeting?
A   I was.
Q   What documents were given out to the
    participants of that meeting, if any?
A   A copy of the search warrant was made
    available to all attendees along with the
    operational plan.
Q   How many attendees were at the meeting that
    took place on the morning of March 22, 2022?
A   At least 24.
Q   Who made copies of the search warrant?
A   I did.
Q   How many copies did you make?
A   I don't know an exact number.
Q   Did you make enough copies that you intended
    at least to give one copy to each participant

**Page 5**

1  at the meeting, or did you make a number of
2  copies so that people who were interested in
3  having a copy could take one?
4  A  Correct. I made, as I recall, at least ten
5     copies of the search warrant, had it
6     circulated around the room so that everyone
7     could inspect it, read it, and ask questions
8     as they saw fit. And then I made certain
9     that my team leads at each of three search
10    warrant locations could have a copy so that
11    it could be executed or provided to the
12    premises or any individual.
13 Q  What is the name of that meeting? I've
14    heard two names, a pre-search instruction
15    meeting, and I think someone else said an
16    operational meeting maybe.
17 A  Yeah, it's a pre-op meeting.
18 Q  A pre-op meeting, okay. So if I understand
19    you correctly, at least -- you made at least
20    ten copies of the search warrant that you
21    had with you at the pre-op meeting, and you
22    circulated those copies of the search
23    warrant to everybody who was present there
24    so that they could ask questions and read
25    it?

**Page 6**

1  A  And inspect the warrant, yes, so that they
2     were comfortable, yes.
3  Q  What questions, if any, did any of the
4     participants at the pre-op meeting ask about
5     what was to be searched -- ask about
6     anything really? What questions did they
7     ask?
8  A  I don't remember.
9        MS. CARSON: Object as to form.
10    Vague. Go ahead and answer.
11       THE WITNESS: I don't recall the
12    questions. There were questions. I did
13    clarify questions. I can't recall what they
14    were and from who they were from.
15 BY MR. OLSEN:
16 Q  Okay. Do you remember if anybody spoke --
17    so in your recollection, some people asked
18    questions of you at the pre-op meeting about
19    something?
20 A  Yes.
21 Q  Okay. Do you remember what the subject
22    matter of the questions that were asked of
23    you at the pre-op meeting was?
24 A  No.
25 Q  You've already said you don't remember who

**Page 7**

1     specifically asked questions of you at the
2     pre-op meeting?
3  A  Correct.
4  Q  In order to facilitate things -- and I think
5     this is clear. When I say pre-op meeting, I
6     mean the meeting that occurred in the
7     morning of March 22, 2022, before the search
8     of the Wolff premises that we're referring
9     to here.
10 A  Yes.
11 Q  Okay. So when I say pre-op meeting, we mean
12    that meeting. I won't go giving this long
13    explanation every time, fair?
14 A  Sure, fair.
15 Q  And at the pre-op meeting, was that when you
16    assigned the team leads?
17 A  I announced who the team leads were. I had
18    discussions with the team leads prior to the
19    pre-op meeting to make certain that their
20    schedules were available and that they were
21    agreeable to their roles.
22 Q  Who were the team leads that you just
23    discussed that were announced at the pre-op
24    meeting?
25 A  Special Agent Matthew Anderson was for

**Page 8**

1     Lakeshore Cleaners address. Special Agent
2     Ryan Windorff was for the investment
3     property at 4801 North Richmond, and Special
4     Agent Eric Beine was for the Nichols
5     homestead residence.
6  Q  I think we don't have more than one person
7     with each last name. So if I just refer to
8     them by agent and then their last name,
9     you'll know who I'm talking about, right?
10 A  Yes, sir.
11 Q  Okay. When did you first talk with Agent
12    Anderson about his assignment in relation to
13    this case?
14 A  I would have no idea. Days, maybe even
15    weeks prior to the pre-op meeting.
16 Q  When did you first show Agent Anderson a
17    copy of the search warrant that's at issue
18    in this case?
19 A  On the morning of the pre-op meeting.
20 Q  Before the pre-op meeting started or at the
21    time that the pre-op meeting started?
22 A  During the meeting when I passed it around
23    to all parties.
24 Q  Would that be the same answer as to Agent
25    Windorff and Agent Beine?

HENES & ASSOCIATES REPORTING SERVICE, INC.
www.henesreporting.com   920-733-1835   henes@henesreporting.com
Page 5 to Page 8 of 38

```
 1  A    Yes.
 2  Q    Did the meetings -- did the pre-op meeting
 3       start at around 7 o'clock a.m.?
 4  A    That's accurate.
 5  Q    Around what time did the pre-op meeting end?
 6  A    Approximately one hour later.
 7  Q    What did you understand would be searched
 8       for at the Wolff premises pursuant to the
 9       affidavit that's at issue in this matter on
10       March 22, 2022?
11  A    I'm confused by your question because you
12       just asked something about the affidavit,
13       and then I think the search warrant is
14       referenced as well.  So which document are
15       we talking about?  Those are two separate
16       legal documents.
17            MR. OLSEN:  Could you read the
18       question back?
19            (Requested portion read by reporter.)
20            MR. OLSEN:  I misspoke.  I'm sorry.
21  BY MR. OLSEN:
22  Q    What did you understand would be searched
23       for at the Wolff premises pursuant to the
24       legal authority that you obtained with a
25       warrant and with an affidavit that supported
                          9
```

```
 1       the issuance of that warrant on March 22,
 2       2022?
 3            MS. CARSON:  Object as to form.
 4       Compound and vague.  Go ahead and answer.
 5            THE WITNESS:  Primarily
 6       communications between any fellow town board
 7       members, employees, or entities that were
 8       involved with quotes and contracts and any
 9       campaign-related documentation.
10  BY MR. OLSEN:
11  Q    Do you remember, as we sit here today, what
12       instructions you gave to the participants at
13       the pre-op meeting as far as what they were
14       searching for?
15  A    Those same articles, so the -- all
16       electronic -- any electronic communications,
17       e-mails, records about discussions related
18       to any town business, contracts, quotes, any
19       town business from the point Mr. Wolff was
20       elected to present.  So there was a very
21       distinct time frame.  So if anything was
22       outside of that time frame, I explicitly
23       said we were not interested and that was not
24       relevant to the warrant.
25  Q    Has the explanation you just gave right now,
                         10
```

```
 1       is that as close as you can remember, as we
 2       sit here today, to the instructions you gave
 3       as you were giving them at the pre-op
 4       meeting?
 5  A    I mean it's not verbatim.  It's not
 6       identical.  But that is a very close and
 7       fair representation or synopsis of what I
 8       wanted executed in accordance with the
 9       warrant.  It's primarily for those
10       communicative records, whether they were
11       electronic mail, text message, talk app
12       communications, whatever those were.
13  Q    And strictly limited to the time that
14       Mr. Wolff was in office?
15  A    That's correct.  I believe it was April of
16       -- there was an exact date that I had
17       offered.  I don't know the exact date.  But
18       I believe it was sometime in April 2021.  So
19       from the point he took office, was sworn
20       into office, to present, at that time.
21  Q    And you also indicated that the search was
22       for campaign materials?
23  A    Communications related to those things.  It
24       was communications that we were after.
25  Q    Communications related to --
                         11
```

```
 1  A    And/or proof of -- I'm sorry.  Go ahead.
 2  Q    Communications related to political
 3       campaigns, other than Mr. Wolff's own,
 4       correct?
 5  A    Anyone that he was communicating with that
 6       was a fellow elected official --
 7  Q    Okay.
 8  A    -- on that town board.
 9  Q    Okay.  But limited to the time after
10       Mr. Wolff took office, correct?
11  A    Yes.
12  Q    And then I believe --
13  A    Or related to his election at that point.
14       That would have been the only thing that
15       would have predated that oath of office
16       time.  The oath of office time involved the
17       communications from the point he took office
18       going forward and then the campaign
19       materials that he utilized to become a
20       member of his office.
21  Q    Okay.  Now, those could be paper documents
22       or electronic records, correct?
23  A    Correct.
24  Q    When people asked questions at the pre-op
25       meeting, did they ask questions, if you
                         12
```

HENES & ASSOCIATES REPORTING SERVICE, INC.
www.henesreporting.com   920-733-1835   henes@henesreporting.com
Page 9 to 12 of 38

**Page 13**

1 remember, about what specifically they were
2 to search for at the Wolff premises on
3 March 22, 2022?
4 A  Again, I don't specify -- I don't recall
5   what their specific questions were.  I
6   answered all questions, and I personally
7   professionally specified the documents that
8   were sought under the search warrant.
9 Q  Who wrote the -- is it the operation plan or
10   the operational plan?  How is that said?
11 A  The operation plan.  I drafted that.
12 Q  Did the operation plan specify exactly what
13   was to be searched for, or was it your
14   verbal instructions that specified exactly
15   what was to be searched for at the Wolff
16   premises on March 22, 2022?
17 A  The search warrant specified the search
18   materials.  The operation plan is a
19   synopsis, a picture and time of the ongoing
20   case and the operation that would be
21   executed, background information.
22 Q  Okay.  So when Officer Anderson -- I'm
23   sorry, Agent -- Special Agent Anderson,
24   right?
25 A  Yes, sir.

**Page 14**

1 Q  When Special Agent Anderson searched the
2   business premises, he would have known,
3   based on your verbal instructions, exactly
4   what he was looking for, correct?
5 A  Yes.  And I was even at that premises while
6   Agent Anderson executed the warrant, so I
7   was available for any questions or
8   clarifications.
9 Q  Were there any areas of the business
10   premises that could have contained records
11   of the type you just described that
12   Special Agent Anderson or the team that he
13   was leading did not search?
14 A  Could you repeat the question?
15     MR. OLSEN:  Yeah.  Can you read it
16   back?
17     (Requested portion read by reporter.)
18     THE WITNESS:  So I want to clarify.
19   There are two businesses at that location.
20   And we attempted to discern what the
21   boundaries of both businesses were, and we
22   contained our search only to the Lakeshore
23   Cleaners business.  I believe all parts of
24   the Lakeshore business were searched.  There
25   were different areas or quadrants inside

**Page 15**

1 that business that were searched.
2 BY MR. OLSEN:
3 Q  So if I understand your answer correctly --
4   and correct me if I'm wrong -- it was
5   Special Agent Anderson and the search team
6   under him that searched all the parts of the
7   Lakeshore Cleaners business that could have
8   contained records of the type that you
9   earlier described as being the target of
10   this search?  Would you call those records
11   the target?
12 A  Focus.
13 Q  The focus?
14 A  Yes, yes.
15 Q  And it was Special Agent Anderson and his
16   team's job to search all the areas of that
17   Lakeshore Cleaners business that could have
18   contained the records that were the focus of
19   the 3/22/22 search and no other areas,
20   correct?
21 A  Yes.
22 Q  And Special Agent Anderson and his team made
23   a best effort to determine what were the
24   boundaries of the Lakeshore Cleaners
25   business and not to search any records of

**Page 16**

1 another business that was present on the
2 premises, fair?
3 A  I believe that's accurate, yes.
4 Q  Special Agent Anderson was responsible for
5   executing the task that I just described,
6   but he would ask you if he had any
7   questions, correct?
8 A  I was available for any clarification
9   questions, yes.
10 Q  All right.  Did Special Agent Anderson
11   actually ask you any questions or
12   clarifications on the day of the search
13   about what should or shouldn't be searched
14   or done on that day?
15 A  There were multiple people that did ask me
16   questions.  I cannot say for certain that it
17   was Special Agent Anderson or others.
18 Q  Now, Special Agent Windorff was the team
19   lead you had testified, I believe, in charge
20   of searching 4801 North Richmond Avenue?
21 A  Yes.
22 Q  And, again, his job would have been to
23   search for the records that you've described
24   and no others, correct?
25 A  His team and him were responsible for

**Page 17**

```
 1      searching.  He was responsible for the
 2      overall documentation, photographing, all
 3      formal documentation and briefing.
 4   Q  Would Special Agent Windorff have been
 5      responsible for using his professional
 6      training to execute the instructions that
 7      you gave at 4801 North Richmond on 3/22/22?
 8   A  Yes.
 9   Q  What questions, if any, did you receive from
10      Special Agent Windorff during the execution
11      of the search warrant on 3/22/22 that you
12      remember here today?
13   A  I don't recall any follow-up.
14   Q  You were here earlier for Special Agent
15      Windorff's deposition, correct?
16   A  Yes.
17   Q  Special Agent Windorff explained that there
18      were three rooms at 4801 North Richmond
19      Avenue property, two of which appeared,
20      based on his analysis of the situation, to
21      be the rooms of Herbert Wolff and a gentleman
22      by the last name of Clark, correct?
23   A  That was his testimony.
24   Q  Right.  And those rooms were searched,
25      correct?
```

**Page 18**

```
 1   A  I believe all rooms were searched.
 2   Q  So unlike the search at the Lakeshore
 3      business premises, which was limited to the
 4      portion of the business -- the portion of
 5      the premises and the area search that were
 6      within the boundaries as your team could
 7      ascertain them of the Lakeshore Cleaners
 8      businesses, the search at 4801 North
 9      Richmond also searched the room of Herbert
10      Wolff, correct?
11   A  Yes.  I don't know whose rooms -- I need to
12      clarify.  I don't know whose rooms were
13      whose.  But all rooms were searched, all
14      vehicles were searched, all buildings were
15      searched in accordance with the warrant.
16   Q  So your understanding -- did you personally
17      go to 4801 North Richmond on the day of the
18      search?
19   A  No.
20   Q  And I should have said not go to.  I should
21      have said did you go into.  You didn't go
22      inside of 4801 North Richmond on the day of
23      the search or any other day, correct?
24   A  I did not.
25   Q  As far as Nichols, what's the address there,
```

**Page 19**

```
 1      do you remember?
 2   A  I don't recall the fire number.
 3   Q  Okay.  At any rate, there was -- the warrant
 4      also referenced the search of the house in
 5      Nichols, correct?
 6   A  Yes.
 7   Q  And that house was -- could you help me with
 8      the pronunciation of that agent's name
 9      again?
10   A  Beine.
11   Q  Beine.
12   A  Special Agent Eric Beine.
13   Q  Okay.  So Special Agent Eric Beine was in
14      charge of the search at Nichols, correct?
15   A  He was the team lead.
16   Q  Okay.  He was the team lead of the group of
17      DCI personnel who searched at Nichols,
18      correct?
19   A  Yes.
20   Q  Did Eric Beine and his team search all the
21      areas at the Nichols' property that could
22      have contained records of the type that
23      you've just described as being the focus of
24      the search?
25   A  I believe so.
```

**Page 20**

```
 1   Q  That would have been their job, correct?
 2   A  Yes.
 3   Q  You never provided copies of the affidavit
 4      upon which the search warrant was -- at
 5      issue in this case was based to any of the
 6      personnel who participated in the search on
 7      March 22, 2022, prior to that date or on
 8      that date, correct?
 9   A  Never.
10   Q  What crimes did you understand you and your
11      personnel were searching for evidence of on
12      March 22, '22, at the Wolff premises?
13   A  Misconduct in public office, a contract
14      violation, open meeting violations, walking
15      quorums, false swearing, and if there was
16      proof of residency violation, that would
17      have expanded or included voting violations.
18   Q  Have you ever executed a search warrant,
19      other than the search warrant on March 22,
20      '22, that was related to the residency or
21      the claimed residency of an elected
22      official?
23   A  The search warrant was primarily for
24      misconduct in public office.  That was the
25      basis and foundation of the warrant.
```

**Page 21**

1 Q So the basis and the foundation of the
2   warrant was not related to residency?
3 A Not primarily. Because when you execute a
4   search warrant, it is automatic that we
5   establish or determine residency when you
6   execute a search warrant. So any time
7   there's an execution of a search warrant, we
8   always try to gain proof, physical or any
9   other proof, of whose residence that is. It
10  is not unusual -- it is very common. In
11  every single search warrant that I've ever
12  done, hundreds of search warrants, you
13  always try to establish a residency, who is
14  -- who lives there and who comes and goes,
15  who's responsible for living there.
16      So lots of times you will search for
17  documents, mail articles, any sort of
18  documents that show residence. It could be
19  tax documents. It could be healthcare
20  records. It could be mail documents. It
21  could be banking documents. It could be
22  ledgers. It can be anything to determine
23  who is in control of a residence. So that's
24  included in the general execution of a
25  search warrant.

**Page 22**

1 Q So the general execution of a search warrant
2   would include any record with the name and I
3   suppose address of the person in the search
4   premises?
5 A Yes. And even more specific if you can --
6   this is outside this warrant. But say you
7   have, you know, a building, and it has
8   multiple units. You know, you're looking
9   for, you know, Unit A or No. 1, or you're
10  looking for proof of things as to who
11  occupies or controls those spaces because we
12  -- that's -- lawfully that's important to
13  understand to make sure that you're not
14  outside of the scope of your warrant.
15 Q I think I got that the basis -- did you use
16  the words primary basis or primary -- I
17  don't remember. You said the primary basis
18  of the warrant or something like that?
19 A Yeah, the focus of the warrant, yeah, the
20  primary basis was for that misconduct in
21  public office because that was more all
22  encompassing of all of those things.
23 Q Okay.
24 A And so that was the minimum probable cause
25  minimal charge that was utilized to

**Page 23**

1   establish that.
2 Q So --
3 A In the warrant. I want to be clear, in the
4   warrant.
5 Q Yeah. I'm trying to steer clear of your
6   investigation here. Okay? The misconduct
7   in public office statute itself -- I am not
8   talking about your theories or your
9   investigation here, which I understand you
10  need to keep private to yourself at this
11  point, is a broadly written statute, fair?
12 A Fair.
13 Q Okay. Are there any -- can you give an
14  example of a document that could not
15  plausibly be evidence of misconduct in
16  public office that was present at the -- for
17  example, the business premises on March 22,
18  2022?
19 A Anything business related. So, you know, if
20  there were -- Mr. Wolff runs a landscape
21  business. There was -- you know, if there's
22  CAD drawings of projects, if there are
23  quotes for work, anything related to the
24  business, or for that matter any personal
25  things, my expectation was to stay clear of

**Page 24**

1   that. We were not there for his business or
2   personal records.
3 Q Okay. You've examined the declarations
4   filed in this matter I'm sure, correct?
5 A Declarations, I don't know what declarations
6   are.
7 Q Let me ask you this. Was -- what would have
8   been the purpose for searching areas where
9   Karri Wolff kept her clothing?
10 A Anything that we were searching for could be
11  hidden or located anywhere. So, for
12  instance, I found -- this is not related,
13  but I have found drugs in cat litter. I
14  have found troves of child pornography in a
15  speaker. It's endless to list where I have
16  found contraband or articles of things of
17  evidentiary matter.
18      So when we're looking for SD cards,
19  thumb drives, cellular telephones, tablet
20  devices, laptop computers, those can be
21  placed anywhere. And in an abundance of
22  thoroughness -- and we didn't know whose
23  areas were whose. So, you know, we try hard
24  to decipher that or determine that. But in
25  order to be thorough, you look in all areas

```
 1     for those articles.
 2  Q  Okay.
 3  A  So we don't know, for instance, what an
 4     underwear drawer is.  We have no idea.  We
 5     don't know which one is the silverware
 6     drawer.  We don't -- you know, I mean, we've
 7     found things in coffee grounds.  So we -- in
 8     an abundance of thoroughness, we look
 9     through everything.
10  Q  Okay.  So in order to properly execute these
11     -- this warrant on March 22, 2022, the
12     agents and their teams had to search every
13     place where there could be on SD card, a
14     thumb drive, a paper, or any of the other
15     types of records that you've described as
16     being the focus of this search, correct?
17  A  Yes.
18  Q  The agents and the team leads had some
19     discretion to not search areas that for
20     whatever reason they felt would not be
21     fruitful, fair?
22  A  Yes.
23  Q  As far as contract violations, what do you
24     mean by that?
25  A  That term is used interchangeably in the
                                                 25
```

```
 1     criminal investigation, and there were
 2     allegations that while Mr. Wolff was seated
 3     in his position, that was part of the
 4     misconduct, that he performed services
 5     outside of his authority or right in
 6     accordance with law.
 7             So if there was -- if there was
 8     evidence of those things, that was part of
 9     the misconduct.  So we were searching for
10     any proof of quotes or quote/unquote
11     contracts.  I have to be very conceded with
12     attorneys, and I've been schooled more than
13     I care to be about contracts versus quotes.
14     But we were looking for those kinds of
15     records that were allegations of Mr. Wolff's
16     misconduct.
17  Q  As far as -- so I think you said misconduct
18     in public office, contract violations, false
19     swearing, possible voting violations.  I
20     feel like I missed one or two.
21  A  The open meeting violations, walking
22     quorums, I mean anything related to those
23     things.
24  Q  Okay.  Is it -- what would be evidence of an
25     open meeting violation that you were looking
                                                 26
```

```
 1     for on -- you and the team of special agents
 2     that you've described, what would be
 3     evidence of an open meeting violation that
 4     you were looking for on March 22, 2022?
 5  A  Mr. Wolff communicating with at least two
 6     other seated board members about the
 7     township business.
 8  Q  Okay.
 9  A  Anything related to decision-making things
10     or township business.
11  Q  Okay.  And so, again, that would be any type
12     of electronic records, any type of paper
13     records, I suppose plausibly recordings, if
14     they existed?
15  A  There are recordings of meetings, so, yeah,
16     that was fair.  That was fair.
17  Q  All right.  The voting violations would be
18     related to residency, correct, or are you
19     saying voting on the town board or voted in
20     an election?
21  A  That's two parts.  I mean Mr. Wolff could
22     have performed votes that were in favor of
23     his personal professional business, and then
24     if indeed he didn't reside where he said he
25     did, you know, and/or Mrs. Wolff, then those
                                                 27
```

```
 1     were germane to my local investigation.
 2  Q  I think I asked you if you had ever done
 3     other searches in relation to politicians
 4     who are accused of not living in the
 5     district.  And then it -- the questions took
 6     a little bit of a turn towards that that
 7     wasn't a primary basis of the warrant.
 8  A  I recall.
 9  Q  Okay.  Let's just go back to that question.
10     Understanding now that you've answered that
11     the primary basis of the warrant was not
12     residency, I would like to ask the question,
13     do you recall ever then investigating a
14     politician on the accusation that that
15     politician did not live in the district
16     where he or she served and represented?
17  A  I have done other investigations where there
18     have been allegations that elected officials
19     did not live in -- within their jurisdiction,
20     which is obviously foundational to
21     democracy.
22  Q  Right.  I think I asked the question poorly.
23     Because what I may be hearing -- and I just
24     want to make sure that it's clear.  What I
25     may be hearing is that you did other
                                                 28
```

**Page 29**

investigations that perhaps had a different -- you know, that were about a number of things, but one strand or tangent of that investigation was that the person didn't live there. I don't know if that's what you were answering or not.

I'm trying to ask, in your recollection have you ever performed an investigation of a politician who has alleged to not be living in their district with no other related allegations that were the primary basis?

A  Yeah. I was involved in an investigation where it was alleged a district attorney didn't live in the county in which they served. I believe I was involved in a school board investigation where the school board member may not have been living in the jurisdiction. So I have done those kinds of investigations previously. Does that answer what you were saying?

Q  On approximately how many occasions?

A  Oh, boy.

Q  Less than ten?

A  I would say less than ten is fair.

**Page 30**

Q  Okay. Could you narrow it down to less than five, or would you prefer to stay at less than ten? It's your call. It's not that important.

A  Yeah, I don't want to misstate and then you try to jab me up on that.

Q  What steps, if any, did you take at the pre-op meeting to make sure that Anderson, Windorff -- that Agents Anderson, Windorff, and Beine and their teams searched all the areas that they needed to search to find the records that you've described and no other areas?

A  And no other areas?

Q  Right. Because they were not supposed to search areas that couldn't contain those materials, but they were supposed to search all the areas of those premises that could contain those materials. And I'm asking, what specific instructions you gave, if any, to make sure that those officers -- those agents, those special agents and their teams, did what they needed to do?

MS. CARSON: I'm going to object as to form. Compound. Go ahead and answer if

**Page 31**

you can.

MR. OLSEN: Oh, because of that. Okay. Let me rephrase it because we've got an objection, so I want to make sure that I have something that can stand up later.

BY MR. OLSEN:

Q  What instructions did you give, if any, at the pre-op meeting to make sure that Special Agents Anderson, Windorff, and Beine and their teams searched all of the areas that they needed to to find the evidence that you've described was being searched for?

A  I didn't exclude areas. I explained the scopes of the warrant and areas that Mr. Wolff alleged to have authority over or a connection with. So it was those three locations. It was his vehicles. It was outbuildings. It was his person. And I explained it was more of the areas that were included versus the areas that were excluded because I didn't know what those would be. Those are -- excuse the pun, but that's a game-time decision. I don't know what areas were going to be out of bounds until you see them or decipher them.

**Page 32**

So, for instance, when we were at the -- at the business location, Lakeshore Cleaners, I didn't necessarily realize or understand what the boundaries were inside that business. So once we understood this was the area of the Legendary Lawn Care business or whatever that was, then we communicated amongst ourselves that's off limits. We're not going there. They're not involved with this.

So -- and I had to rely on the professional experience and training of those individuals that I was very comfortable with to be able to make those choices and decisions.

Q  Okay. So as to 4801 North Richmond Avenue, it would have -- one possibility would have been to not search the rooms of Herbert Wolff and Mr. Karp once it became apparent that those might be their rooms, but another decision might be that it needed to be searched because perhaps there would be evidence there of the type that you described, correct?

A  Those professionals did not know what rooms

**Page 33**

1 were in whose control. And that investment
2 property was in Mr. and Mrs. Wolff's name.
3 So there was indication that there were
4 other parties living there, but the whole
5 thing had to be searched. And to this day,
6 there's still no proof of -- that I'm aware
7 of. I have no impression. I have no
8 knowledge or information as to whose area
9 was whose area. I have no idea.
10 Q Okay.
11 A That investment property was owned by the
12 Wolffs. That's what I know. And through my
13 own human intelligence, I knew that there
14 were two individuals that were staying
15 there. I have no idea where their -- where
16 their areas -- you know, where their private
17 areas were. I have no idea.
18 Q Okay. But the whole business property was
19 also owned by the Wolffs, correct?
20 A Correct.
21 Q But, nevertheless, you made the discretionary
22 decision to determine what were the
23 boundaries of the Legendary Lawn Care and
24 not search that area on the day of,
25 game-time decision, correct?

**Page 34**

1 A Based on Mr. Wolff's input.
2 Q Okay. And, similarly, the officers who went
3 to 4801 North Richmond Avenue -- I keep
4 saying officers. The special agents who
5 went to 4801 North Richmond Avenue, they
6 were also -- based on their oath and all
7 their training, they also had to make
8 discretionary decisions about where to
9 search and where not to search, correct?
10 A Yes.
11 Q And similarly, in Nichols Eric --
12 A Beine.
13 Q -- Beine -- thank you -- and his team had to
14 make discretionary decisions day of where to
15 find this rather broad array of evidence
16 that could evidence all these items that
17 were the primary focus of the investigation
18 and then look there, correct?
19 A Yes.
20 Q Okay. And they also had to decide which
21 areas not to look in, correct?
22 A I can't answer that. I --
23 Q Okay.
24 A I know what areas were included in the
25 warrant, and that was conveyed to my

**Page 35**

1 colleagues. And I believe they searched in
2 those areas. I don't know of any areas that
3 were out of bounds or off limits to us at
4 the properties that they owned.
5 Q I am not suggesting that there were. I'm
6 saying that, for example, just to be
7 perfectly frank here, I don't think anybody
8 looked in the coffee grounds. And you're
9 saying that you found things like that there
10 before. So they had some discretion --
11 A Not there.
12 Q No, no. In other searches you found
13 incriminating evidence in -- you gave two
14 examples -- coffee grounds and kitty litter.
15 You said it was drugs and a trove of other
16 -- first of all, whatever was ultimately
17 found, there was no intention of searching
18 for any narcotics on 3/22/22 at the Wolff
19 premises, correct?
20 A Never.
21 Q Right.
22 A At either of the -- at any of the Wolff
23 premises.
24 Q Fair. And, similarly, although obviously
25 there was an investigation into the things

**Page 36**

1 you've described, there was never any
2 allegation of anything like child
3 pornography? That was an example you gave
4 to illustrate a point about other cases,
5 correct?
6 A There's a point to illustrate that if
7 someone is involved in criminal misconduct,
8 they will go to great lengths to hide,
9 withdraw evidence of what they're involved
10 with. So anything can be stored anywhere,
11 you know, qualified with size, right? If
12 I'm going to a location and I'm looking for
13 a car, I can't go in their kitchen drawers.
14 Q But in this case, the evidence could have
15 been on a little SD card? It could have
16 been on a thumb drive? So every place that
17 could have contained an item like that had
18 to be searched, correct?
19 A Yes.
20 Q I understand that at the different locations
21 not every single area that could have
22 contained an SD card was searched. So I'm
23 asking you if that is, in fact, the case,
24 that would have been up to the discretion of
25 each team leader and each special agent to

```
 1     figure out what was worth searching and what
 2     was not, correct?
 3  A  I don't know that -- I was told that all
 4     areas were searched.
 5  Q  Okay.  So if there was any area that could
 6     have contained information -- evidence of
 7     the type that you described as being -- that
 8     we've talked about again and again, so I'm
 9     not going to reiterate it -- all the areas
10     that could have contained that should have
11     been searched, right?
12  A  I believe so, yes.
13           MR. OLSEN:  We're really almost done
14     here.  I'm going to ask Attorney Curtis for
15     some input.
16           MR. CURTIS:  No.  I think you pretty
17     well covered it.  You've asked more
18     questions than I would have, and you got
19     some good information.
20           MR. OLSEN:  All right.  With that,
21     that is the end of the deposition.  Thank
22     you very much.
23           (Matter concluded at 11:00 a.m.)
24
25
                                            37
```

```
 1     STATE OF WISCONSIN    )
                             )  ss.
 2     COUNTY OF WASHINGTON  )
 3
 4        I, Jessica Koepsell, Certified Realtime
 5     Reporter and Notary Public in and for the
 6     State of Wisconsin, do hereby certify that
 7     the attached and foregoing deposition was
 8     taken via videoconference, on the 30th day
 9     of June, 2023, A.D., at 10:10 a.m.; that it
10     was taken at the request of the adverse
11     parties, upon oral interrogatories; that
12     said JAY YERGES was sworn by me to tell the
13     truth, the whole truth, and nothing but the
14     truth relative to said cause.
15        Dated this 11th day of July, 2023.
16
17           HENES & ASSOCIATES
             COURT REPORTING SERVICE
18
19           _____
20           Jessica Koepsell
             Registered Professional Reporter
21           Certified Realtime Reporter
22
     My commission expires January 24, 2024.
23
24
25
                                            38
```

Jay Yerges

**'**

'22 [2] - 20:12, 20:20

**1**

1 [1] - 22:9
10:10 [2] - 3:8, 38:9
11:00 [1] - 37:23
11th [1] - 38:15

**2**

2021 [1] - 11:18
2022 [12] - 3:16, 4:7, 4:18, 7:7, 9:10, 10:2, 13:3, 13:16, 20:7, 23:18, 25:11, 27:4
2023 [4] - 1:16, 3:9, 38:9, 38:15
2024 [1] - 38:22
22 [12] - 4:18, 7:7, 9:10, 10:1, 13:3, 13:16, 20:7, 20:12, 20:19, 23:17, 25:11, 27:4
22-cv-177-wmc [1] - 1:5
22nd [2] - 3:16, 4:7
24 [2] - 4:19, 38:22

**3**

3/22/22 [4] - 15:19, 17:7, 17:11, 35:18
30 [1] - 3:9
30th [2] - 1:15, 38:8

**4**

4801 [10] - 8:3, 16:20, 17:7, 17:18, 18:8, 18:17, 18:22, 32:16, 34:3, 34:5

**7**

7 [1] - 9:3

**A**

A.D [2] - 1:16, 38:9
a.m [4] - 3:8, 9:3, 37:23, 38:9
able [1] - 32:14
abundance [2] - 24:21, 25:8
ACCIDENT [1] - 2:2
accordance [3] - 11:8, 18:15, 26:6
accurate [2] - 9:4, 16:3
accusation [1] - 28:14
accused [1] - 28:4
action [1] - 1:17
address [3] - 8:1, 18:25, 22:3
ADMINISTRATOR [1] - 1:6
adverse [1] - 38:10
affidavit [4] - 9:9, 9:12, 9:25, 20:3
Agent [26] - 3:13, 7:25, 8:1, 8:4, 8:11, 8:16, 8:24, 8:25, 13:23, 14:1, 14:6, 14:12, 15:5, 15:15, 15:22, 16:4, 16:10, 16:17, 16:18, 17:4, 17:10, 17:14, 17:17, 19:12, 19:13
agent [2] - 8:8, 36:25
AGENT [1] - 1:7
agent's [1] - 19:8
Agents [2] - 30:9, 31:9
agents [6] - 25:12, 25:18, 27:1, 30:22, 34:4
agreeable [1] - 7:21
ahead [4] - 6:10, 10:4, 12:1, 30:25
allegation [1] - 36:2
allegations [4] - 26:2, 26:15, 28:18, 29:11
alleged [3] - 29:10, 29:14, 31:15
almost [1] - 37:13
analysis [1] - 17:20
Anderson [17] - 7:25, 8:12, 8:16, 13:22, 13:23, 14:1, 14:6, 14:12, 15:5, 15:15, 15:22, 16:4, 16:10, 16:17, 30:8, 30:9, 31:9
announced [2] - 7:17, 7:23
answer [9] - 3:4, 3:5, 6:10, 8:24, 10:4, 15:3, 29:20, 30:25, 34:22
answered [2] - 13:6, 28:10
answering [1] - 29:6
APEX [1] - 2:2
app [1] - 11:11
apparent [1] - 32:19
APPEARANCES [1] - 2:1
appeared [4] - 2:3, 2:5, 2:8, 17:19
Appleton [1] - 4:7
April [2] - 11:15, 11:18
area [7] - 18:5, 32:6, 33:8, 33:9, 33:24, 36:21, 37:5
areas [28] - 14:9, 14:25, 15:16, 15:19, 19:21, 24:8, 24:23, 24:25, 25:19, 30:11, 30:13, 30:14, 30:16, 30:18, 31:10, 31:13, 31:14, 31:19, 31:20, 31:23, 33:16, 33:17, 34:21, 34:24, 35:2, 37:4, 37:9
array [1] - 34:15
articles [4] - 10:15, 21:17, 24:16, 25:1
ascertain [1] - 18:7
assigned [1] - 7:16
assignment [1] - 8:12
ASSOCIATES [1] - 38:17
attached [1] - 38:7
attempted [1] - 14:20
attendees [2] - 4:15, 4:17
Attorney [1] - 37:14
attorney [2] - 3:22, 29:14
attorneys [1] - 26:12
ATTORNEYS [1] - 2:2
authority [3] - 9:24, 26:5, 31:15
automatic [1] - 21:4
available [4] - 4:15, 7:20, 14:7, 16:8
Avenue [5] - 16:20, 17:19, 32:16, 34:3, 34:5
aware [1] - 33:6

**B**

background [1] - 13:21
banking [1] - 21:21
based [5] - 14:3, 17:20, 20:5, 34:1, 34:6
basic [1] - 3:21
basis [9] - 20:25, 21:1, 22:15, 22:16, 22:17, 22:20, 28:7, 28:11, 29:12
became [1] - 32:19
become [1] - 12:19
began [1] - 3:8
behalf [3] - 2:3, 2:5, 2:8
Beine [11] - 8:4, 8:25, 19:10, 19:11, 19:12, 19:13, 19:20, 30:10, 31:9, 34:12, 34:13
best [1] - 15:23
between [1] - 10:6
bit [1] - 28:6
board [6] - 10:6, 12:8, 27:6, 27:19, 29:17, 29:18
boundaries [5] - 14:21, 15:24, 18:6, 32:4, 33:23
bounds [2] - 31:24, 35:3
boy [1] - 29:23
briefing [1] - 17:3
broad [1] - 34:15
broadly [1] - 23:11
building [1] - 22:7
buildings [1] - 18:14
business [25] - 10:18, 10:19, 14:2, 14:9, 14:23, 14:24, 15:1, 15:7, 15:17, 15:25, 16:1, 18:3, 18:4, 23:17, 23:19, 23:21, 23:24, 24:1, 27:7, 27:10, 27:23, 32:2, 32:5, 32:7, 33:18
businesses [3] - 14:19, 14:21, 18:8
BY [6] - 3:12, 6:15, 9:21, 10:10, 15:2, 31:6

**C**

CAD [1] - 23:22
campaign [3] - 10:9, 11:22, 12:18
campaign-related [1] - 10:9
campaigns [1] - 12:3
cannot [1] - 16:16
capacity [2] - 1:7, 1:8
car [1] - 36:13
card [3] - 25:13, 36:15, 36:22
cards [1] - 24:18
care [1] - 26:13
Care [2] - 32:6, 33:23
CARSON [4] - 2:8, 6:9, 10:3, 30:24
Case [1] - 1:5
case [7] - 3:15, 8:13, 8:18, 13:20, 20:5, 36:14, 36:23
cases [1] - 36:4
cat [1] - 24:13
cellular [1] - 24:19
certain [4] - 1:17, 5:8, 7:19, 16:16
Certified [2] - 38:4, 38:21
certify [1] - 38:6
charge [4] - 4:10, 16:19, 19:14, 22:25
child [2] - 24:14, 36:2
choices [1] - 32:15
circulated [2] - 5:6, 5:22
claimed [1] - 20:21
clarification [2] - 3:24, 16:8
clarifications [2] - 14:8, 16:12
clarify [3] - 6:13, 14:18, 18:12
Clark [1] - 17:22
Cleaners [7] - 8:1, 14:23, 15:7, 15:17, 15:24, 18:7, 32:3
clear [5] - 7:5, 23:3, 23:5, 23:25, 28:24
close [2] - 11:1, 11:6
clothing [1] - 24:9
coffee [3] - 25:7, 35:8, 35:14
colleagues [1] - 35:1
comfortable [2] - 6:2, 32:14
commission [1] - 38:22
common [1] - 21:10
communicated [1] - 32:8
communicating [2] - 12:5, 27:5
communications [8] - 10:6, 10:16, 11:12, 11:23, 11:24, 11:25, 12:2, 12:17
communicative [1] - 11:10
compound [2] - 10:4, 30:25

*1*

**computers** [1] - 24:20
**conceded** [1] - 26:11
**concluded** [1] - 37:23
**confused** [1] - 9:11
**connection** [1] - 31:16
**contain** [2] - 30:16, 30:19
**contained** [9] - 14:10, 14:22, 15:8, 15:18, 19:22, 36:17, 36:22, 37:6, 37:10
**contraband** [1] - 24:16
**contract** [3] - 20:13, 25:23, 26:18
**contracts** [4] - 10:8, 10:18, 26:11, 26:13
**control** [2] - 21:23, 33:1
**controls** [1] - 22:11
**conveyed** [1] - 34:25
**copies** [8] - 4:20, 4:22, 4:24, 5:2, 5:5, 5:20, 5:22, 20:3
**copy** [5] - 4:14, 4:25, 5:3, 5:10, 8:17
**correct** [38] - 3:16, 3:19, 5:4, 7:3, 11:15, 12:4, 12:10, 12:22, 12:23, 14:4, 15:4, 15:20, 16:7, 16:24, 17:15, 17:22, 17:25, 18:10, 18:23, 19:5, 19:14, 19:18, 20:1, 20:8, 24:4, 25:16, 27:18, 32:24, 33:19, 33:20, 33:25, 34:9, 34:18, 34:21, 35:19, 36:5, 36:18, 37:2
**correctly** [2] - 5:19, 15:3
**COUNTY** [1] - 38:2
**county** [1] - 29:15
**COURT** [2] - 1:1, 38:17
**Court** [1] - 1:18
**covered** [1] - 37:17
**crimes** [1] - 20:10
**criminal** [2] - 26:1, 36:7
**CRR** [1] - 1:25
**Curtis** [1] - 37:14
**CURTIS** [2] - 2:2, 37:16

**D**

**date** [4] - 11:16, 11:17, 20:7, 20:8
**Dated** [1] - 38:15
**days** [1] - 8:14
**DCI** [1] - 19:17
**decide** [1] - 34:20
**decipher** [2] - 24:24, 31:25
**decision** [5] - 27:9, 31:23, 32:21, 33:22, 33:25
**decision-making** [1] - 27:9
**decisions** [3] - 32:15, 34:8, 34:14
**declarations** [3] - 24:3, 24:5
**Defendants** [2] - 1:9, 2:9
**democracy** [1] - 28:21
**DEPARTMENT** [1] - 2:7
**deposed** [4] - 3:5, 3:18, 3:20
**DEPOSITION** [1] - 1:11
**deposition** [4] - 1:14, 17:15, 37:21, 38:7
**described** [12] - 14:11, 15:9, 16:5, 16:23, 19:23, 25:15, 27:2, 30:12, 31:12, 32:24, 36:1, 37:7
**determine** [5] - 15:23, 21:5, 21:22, 24:24, 33:22
**devices** [1] - 24:20
**different** [3] - 14:25, 29:1, 36:20
**discern** [1] - 14:20
**discretion** [3] - 25:19, 35:10, 36:24
**discretionary** [3] - 33:21, 34:8, 34:14
**discussed** [1] - 7:23
**discussions** [2] - 7:18, 10:17
**distinct** [1] - 10:21
**district** [4] - 28:5, 28:15, 29:10, 29:14
**DISTRICT** [2] - 1:1, 1:1
**District** [2] - 1:18
**document** [2] - 9:14, 23:14
**documentation** [3] - 10:9, 17:2, 17:3
**documents** [9] - 4:12, 9:16, 12:21, 13:7, 21:17, 21:18, 21:19, 21:20, 21:21
**DOMAIN** [1] - 2:4
**done** [6] - 16:14, 21:12, 28:2, 28:17, 29:19, 37:13
**down** [1] - 30:1
**drafted** [1] - 13:11
**drawer** [2] - 25:4, 25:6
**drawers** [1] - 36:13
**drawings** [1] - 23:22
**drive** [2] - 25:14, 36:16
**drives** [1] - 24:19
**drugs** [2] - 24:13, 35:15
**duly** [1] - 3:2
**during** [2] - 8:22, 17:10

**E**

**e-mails** [1] - 10:17
**effort** [1] - 15:23
**either** [1] - 35:22
**elected** [4] - 10:20, 12:6, 20:21, 28:18
**election** [2] - 12:13, 27:20
**electronic** [5] - 10:16, 11:11, 12:22, 27:12
**EMINENT** [1] - 2:4
**employees** [1] - 10:7
**encompassing** [1] - 22:22
**end** [2] - 9:5, 37:21
**endless** [1] - 24:15
**entities** [1] - 10:7
**Eric** [5] - 8:4, 19:12, 19:13, 19:20, 34:11
**ERIK** [1] - 2:5
**establish** [3] - 21:5, 21:13, 23:1
**evidence** [13] - 20:11, 23:15, 26:8, 26:24, 27:3, 31:11, 32:23, 34:15, 34:16, 35:13, 36:9, 36:14, 37:6
**evidentiary** [1] - 24:17
**exact** [3] - 4:23, 11:16, 11:17
**exactly** [3] - 13:12, 13:14, 14:3
**examination** [1] - 3:8
**EXAMINATION** [1] - 3:11
**examined** [1] - 24:3
**example** [4] - 23:14, 23:17, 35:6, 36:3
**examples** [1] - 35:14
**exclude** [1] - 31:13
**excluded** [1] - 31:20
**excuse** [1] - 31:22
**execute** [4] - 17:6, 21:3, 21:6, 25:10
**executed** [5] - 5:11, 11:8, 13:21, 14:6, 20:18
**executing** [1] - 16:5
**execution** [4] - 17:10, 21:7, 21:24, 22:1
**EXHIBIT** [1] - 2:13
**EXHIBITS** [1] - 2:12
**existed** [1] - 27:14
**expanded** [1] - 20:17
**expectation** [1] - 23:25
**experience** [1] - 32:12
**expires** [1] - 38:22
**explained** [3] - 17:17, 31:13, 31:19
**explanation** [2] - 7:13, 10:25
**explicitly** [1] - 10:22

**F**

**facilitate** [1] - 7:4
**fact** [1] - 36:23
**fair** [13] - 4:3, 4:4, 7:13, 7:14, 11:7, 16:2, 23:11, 23:12, 25:21, 27:16, 29:25, 35:24
**false** [2] - 20:15, 26:18
**far** [4] - 10:13, 18:25, 25:23, 26:17
**favor** [1] - 27:22
**fellow** [2] - 10:6, 12:6
**felt** [1] - 25:20
**field** [1] - 4:7
**figure** [1] - 37:1
**filed** [1] - 24:4
**fire** [1] - 19:2
**firm** [3] - 2:3, 2:5, 2:8
**first** [5] - 3:1, 4:5, 8:11, 8:16, 35:16
**fit** [1] - 5:8
**five** [1] - 30:2
**focus** [7] - 15:12, 15:13, 15:18, 19:23, 22:19, 25:16, 34:17
**follow** [1] - 17:13
**follow-up** [1] - 17:13
**follows** [1] - 3:6
**FOR** [1] - 1:1
**foregoing** [1] - 38:7
**form** [3] - 6:9, 10:3, 30:25
**formal** [1] - 17:3
**forth** [1] - 1:20
**forward** [1] - 12:18
**foundation** [2] - 20:25, 21:1
**foundational** [1] - 28:20
**frame** [2] - 10:21, 10:22
**frank** [1] - 35:7
**fruitful** [1] - 25:21

**G**

**gain** [1] - 21:8
**game** [2] - 31:23, 33:25
**game-time** [2] - 31:23, 33:25
**general** [2] - 21:24, 22:1
**gentleman** [1] - 17:21
**GEORGE** [1] - 2:2
**germane** [1] - 28:1
**GESINA** [1] - 2:8
**given** [1] - 4:12
**great** [1] - 36:8
**grounds** [3] - 25:7, 35:8, 35:14
**group** [1] - 19:16

**H**

**hard** [1] - 24:23
**healthcare** [1] - 21:19
**heard** [1] - 5:14
**hearing** [2] - 28:23,

*2*

Jay Yerges

28:25
**held** [1] - 4:6
**help** [1] - 19:7
**HENES** [1] - 38:17
**Herbert** [3] - 17:21, 18:9, 32:18
**hereby** [1] - 38:6
**hidden** [1] - 24:11
**hide** [1] - 36:8
**homestead** [1] - 8:5
**hour** [1] - 9:6
**house** [2] - 19:4, 19:7
**human** [1] - 33:13
**hundreds** [1] - 21:12

**I**

**idea** [5] - 8:14, 25:4, 33:9, 33:15, 33:17
**identical** [1] - 11:6
**illustrate** [2] - 36:4, 36:6
**important** [2] - 22:12, 30:4
**impression** [1] - 33:7
**IN** [1] - 1:1
**include** [1] - 22:2
**included** [4] - 20:17, 21:24, 31:20, 34:24
**incriminating** [1] - 35:13
**indeed** [1] - 27:24
**INDEX** [1] - 2:12
**indicated** [1] - 11:21
**indication** [1] - 33:3
**individual** [1] - 5:12
**individuals** [2] - 32:13, 33:14
**information** [4] - 13:21, 33:8, 37:6, 37:19
**input** [2] - 34:1, 37:15
**inside** [3] - 14:25, 18:22, 32:4
**inspect** [2] - 5:7, 6:1
**instance** [3] - 24:12, 25:3, 32:1
**instruction** [1] - 5:14
**instructions** [7] - 10:12, 11:2, 13:14, 14:3, 17:6, 30:20, 31:7
**intelligence** [1] - 33:13
**intended** [1] - 4:24
**intention** [1] - 35:17
**interchangeably** [1]

- 25:25
**interested** [2] - 5:2, 10:23
**interrogatories** [2] - 3:5, 38:11
**investigating** [1] - 28:13
**investigation** [10] - 23:6, 23:9, 26:1, 28:1, 29:4, 29:9, 29:13, 29:17, 34:17, 35:25
**investigations** [3] - 28:17, 29:1, 29:20
**investment** [3] - 8:2, 33:1, 33:11
**involved** [7] - 10:8, 12:16, 29:13, 29:16, 32:10, 36:7, 36:9
**involving** [1] - 3:15
**issuance** [1] - 10:1
**issue** [3] - 8:17, 9:9, 20:5
**item** [1] - 36:17
**items** [1] - 34:16
**itself** [1] - 23:7

**J**

**jab** [1] - 30:6
**January** [1] - 38:22
**JAY** [5] - 1:7, 1:11, 1:14, 3:1, 38:12
**Jessica** [3] - 1:25, 38:4, 38:20
**job** [3] - 15:16, 16:22, 20:1
**JR** [1] - 1:3
**July** [1] - 38:15
**June** [3] - 1:15, 3:9, 38:9
**jurisdiction** [2] - 28:19, 29:19
**JUSTICE** [1] - 2:7

**K**

**Karp** [1] - 32:19
**Karri** [1] - 24:9
**KARRI** [1] - 1:3
**keep** [2] - 23:10, 34:3
**kept** [1] - 24:9
**kinds** [2] - 26:14, 29:19
**kitchen** [1] - 36:13
**kitty** [1] - 35:14
**knowledge** [1] - 33:8
**known** [1] - 14:2
**Koepsell** [3] - 1:25, 38:4, 38:20

**L**

**Lakeshore** [9] - 8:1, 14:22, 14:24, 15:7, 15:17, 15:24, 18:2, 18:7, 32:2
**landscape** [1] - 23:20
**laptop** [1] - 24:20
**last** [3] - 8:7, 8:8, 17:22
**law** [1] - 26:6
**lawfully** [1] - 22:12
**Lawn** [2] - 32:6, 33:23
**lead** [3] - 16:19, 19:15, 19:16
**leader** [1] - 36:25
**leading** [1] - 14:13
**leads** [6] - 5:9, 7:16, 7:17, 7:18, 7:22, 25:18
**least** [6] - 4:19, 4:25, 5:4, 5:19, 27:5
**ledgers** [1] - 21:22
**legal** [2] - 9:16, 9:24
**Legendary** [2] - 32:6, 33:23
**lengths** [1] - 36:8
**less** [4] - 29:24, 29:25, 30:1, 30:2
**limited** [3] - 11:13, 12:9, 18:3
**limits** [2] - 32:9, 35:3
**list** [1] - 24:15
**litter** [2] - 24:13, 35:14
**live** [4] - 28:15, 28:19, 29:5, 29:15
**lives** [1] - 21:14
**living** [5] - 21:15, 28:4, 29:10, 29:18, 33:4
**LLC** [2] - 2:2, 2:4
**local** [1] - 28:1
**located** [1] - 24:11
**location** [3] - 14:19, 32:2, 36:12
**locations** [3] - 5:10, 31:17, 36:20
**look** [4] - 24:25, 25:8, 34:18, 34:21
**looked** [1] - 35:8
**looking** [8] - 14:4, 22:8, 22:10, 24:18, 26:14, 26:25, 27:4, 36:12

**M**

**Madison** [2] - 2:5,

2:7
**mail** [3] - 11:11, 21:17, 21:20
**mails** [1] - 10:17
**March** [14] - 3:16, 4:7, 4:18, 7:7, 9:10, 10:1, 13:3, 13:16, 20:7, 20:12, 20:19, 23:17, 25:11, 27:4
**MARKED** [1] - 2:13
**Marked** [1] - 2:15
**materials** [5] - 11:22, 12:19, 13:18, 30:17, 30:19
**matter** [5] - 6:22, 9:9, 23:24, 24:4, 24:17
**Matter** [1] - 37:23
**Matthew** [1] - 7:25
**mean** [7] - 7:6, 7:11, 11:5, 25:6, 25:24, 26:22, 27:21
**meeting** [39] - 4:6, 4:8, 4:10, 4:13, 4:17, 5:1, 5:13, 5:15, 5:16, 5:17, 5:18, 5:21, 6:4, 6:18, 6:23, 7:2, 7:5, 7:6, 7:11, 7:12, 7:15, 7:19, 7:24, 8:15, 8:19, 8:20, 8:21, 8:22, 9:2, 9:5, 10:13, 11:4, 12:25, 20:14, 26:21, 26:25, 27:3, 30:8, 31:8
**meetings** [2] - 9:2, 27:15
**member** [2] - 12:20, 29:18
**members** [2] - 10:7, 27:6
**message** [1] - 11:11
**might** [3] - 3:25, 32:20, 32:21
**minimal** [1] - 22:25
**minimum** [1] - 22:24
**misconduct** [10] - 20:13, 20:24, 22:20, 23:6, 23:15, 26:4, 26:9, 26:16, 26:17, 36:7
**missed** [1] - 26:20
**misspoke** [1] - 9:20
**misstate** [1] - 30:5
**morning** [3] - 4:18, 7:7, 8:19
**MR** [15] - 2:2, 2:5, 3:12, 6:15, 9:17, 9:20, 9:21, 10:10,

14:15, 15:2, 31:2, 31:6, 37:13, 37:16, 37:20
**MS** [4] - 2:8, 6:9, 10:3, 30:24
**multiple** [2] - 16:15, 22:8

**N**

**name** [7] - 5:13, 8:7, 8:8, 17:22, 19:8, 22:2, 33:2
**names** [1] - 5:14
**narcotics** [1] - 35:18
**narrow** [1] - 30:1
**necessarily** [1] - 32:3
**need** [2] - 18:11, 23:10
**needed** [4] - 30:11, 30:23, 31:11, 32:21
**never** [4] - 20:3, 20:9, 35:20, 36:1
**nevertheless** [1] - 33:21
**Nichols** [6] - 8:4, 18:25, 19:5, 19:14, 19:17, 34:11
**Nichols'** [1] - 19:21
**None** [1] - 2:15
**North** [10] - 8:3, 16:20, 17:7, 17:18, 18:8, 18:17, 18:22, 32:16, 34:3, 34:5
**Notary** [1] - 38:5
**nothing** [2] - 3:3, 38:13
**number** [4] - 4:23, 5:1, 19:2, 29:2
**NUMBER** [1] - 2:13

**O**

**o'clock** [1] - 9:3
**oath** [3] - 12:15, 12:16, 34:6
**object** [4] - 3:22, 6:9, 10:3, 30:24
**objection** [1] - 31:4
**obtained** [1] - 9:24
**obviously** [2] - 28:20, 35:24
**occasions** [1] - 29:22
**occupies** [1] - 22:11
**occurred** [1] - 7:6
**OF** [6] - 1:1, 1:11, 2:7, 38:1, 38:2
**offered** [1] - 11:17
**office** [15] - 4:7,

3

Jay Yerges

| | | | | |
|---|---|---|---|---|
| 11:14, 11:19, 11:20, 12:10, 12:15, 12:16, 12:17, 12:20, 20:13, 20:24, 22:21, 23:7, 23:16, 26:18<br>**Officer** [1] - 13:22<br>**officers** [3] - 30:21, 34:2, 34:4<br>**official** [4] - 1:7, 1:8, 12:6, 20:22<br>**officials** [1] - 28:18<br>**OLSEN** [13] - 2:5, 3:12, 6:15, 9:17, 9:20, 9:21, 10:10, 14:15, 15:2, 31:2, 31:6, 37:13, 37:20<br>**once** [2] - 32:5, 32:19<br>**one** [8] - 4:25, 5:3, 8:6, 9:6, 25:5, 26:20, 29:3, 32:17<br>**ongoing** [1] - 13:19<br>**op** [23] - 5:17, 5:18, 5:21, 6:4, 6:18, 6:23, 7:2, 7:5, 7:11, 7:15, 7:19, 7:23, 8:15, 8:19, 8:20, 8:21, 9:2, 9:5, 10:13, 11:3, 12:24, 30:8, 31:8<br>**open** [4] - 20:14, 26:21, 26:25, 27:3<br>**operation** [5] - 13:9, 13:11, 13:12, 13:18, 13:20<br>**operational** [3] - 4:16, 5:16, 13:10<br>**oral** [2] - 3:4, 38:11<br>**order** [3] - 7:4, 24:25, 25:10<br>**Oshkosh** [1] - 2:2<br>**otherwise** [2] - 1:16, 3:25<br>**ourselves** [1] - 32:8<br>**outbuildings** [1] - 31:18<br>**outside** [4] - 10:22, 22:6, 22:14, 26:5<br>**overall** [1] - 17:2<br>**own** [2] - 12:3, 33:13<br>**owned** [3] - 33:11, 33:19, 35:4<br><br>**P**<br><br>**PAGE** [1] - 2:13<br>**paper** [3] - 12:21, 25:14, 27:12<br>**part** [2] - 26:3, 26:8<br>**participant** [1] - 4:25 | **participants** [3] - 4:13, 6:4, 10:12<br>**participated** [1] - 20:6<br>**parties** [4] - 1:19, 8:23, 33:4, 38:11<br>**parts** [3] - 14:23, 15:6, 27:21<br>**passed** [1] - 8:22<br>**pending** [1] - 1:17<br>**people** [4] - 5:2, 6:17, 12:24, 16:15<br>**perfectly** [1] - 35:7<br>**performed** [3] - 26:4, 27:22, 29:8<br>**perhaps** [2] - 29:1, 32:22<br>**person** [4] - 8:6, 22:3, 29:4, 31:18<br>**personal** [4] - 1:8, 23:24, 24:2, 27:23<br>**personally** [2] - 13:6, 18:16<br>**personnel** [3] - 19:17, 20:6, 20:11<br>**photographing** [1] - 17:2<br>**physical** [1] - 21:8<br>**picture** [1] - 13:19<br>**place** [4] - 3:16, 4:18, 25:13, 36:16<br>**placed** [1] - 24:21<br>**Plaintiffs** [3] - 1:4, 2:3, 2:6<br>**plan** [6] - 4:16, 13:9, 13:10, 13:11, 13:12, 13:18<br>**plausibly** [2] - 23:15, 27:13<br>**point** [7] - 10:19, 11:19, 12:13, 12:17, 23:11, 36:4, 36:6<br>**political** [1] - 12:2<br>**politician** [3] - 28:14, 28:15, 29:9<br>**politicians** [1] - 28:3<br>**poorly** [1] - 28:22<br>**pornography** [2] - 24:14, 36:3<br>**portion** [4] - 9:19, 14:17, 18:4<br>**position** [1] - 26:3<br>**possibility** [1] - 32:17<br>**possible** [1] - 26:19<br>**pre** [25] - 4:6, 5:14, 5:17, 5:18, 5:21, 6:4, 6:18, 6:23, 7:2, 7:5, 7:11, 7:15, 7:19, 7:23, 8:15, 8:19, 8:20, | 8:21, 9:2, 9:5, 10:13, 11:3, 12:24, 30:8, 31:8<br>**pre-op** [23] - 5:17, 5:18, 5:21, 6:4, 6:18, 6:23, 7:2, 7:5, 7:11, 7:15, 7:19, 7:23, 8:15, 8:19, 8:20, 8:21, 9:2, 9:5, 10:13, 11:3, 12:24, 30:8, 31:8<br>**pre-search** [2] - 4:6, 5:14<br>**predated** [1] - 12:15<br>**prefer** [1] - 30:2<br>**premise** [1] - 3:21<br>**premises** [18] - 5:12, 7:8, 9:8, 9:23, 13:2, 13:16, 14:2, 14:5, 14:10, 16:2, 18:3, 18:5, 20:12, 22:4, 23:17, 30:18, 35:19, 35:23<br>**present** [5] - 5:23, 10:20, 11:20, 16:1, 23:16<br>**pretty** [1] - 37:16<br>**previously** [1] - 29:20<br>**primarily** [4] - 10:5, 11:9, 20:23, 21:3<br>**primary** [8] - 22:16, 22:17, 22:20, 28:7, 28:11, 29:12, 34:17<br>**private** [2] - 23:10, 33:16<br>**probable** [1] - 22:24<br>**problem** [1] - 3:25<br>**professional** [3] - 17:5, 27:23, 32:12<br>**Professional** [1] - 38:20<br>**professionally** [1] - 13:7<br>**professionals** [1] - 32:25<br>**projects** [1] - 23:22<br>**pronunciation** [1] - 19:8<br>**proof** [7] - 12:1, 20:16, 21:8, 21:9, 22:10, 26:10, 33:6<br>**properly** [1] - 25:10<br>**properties** [1] - 35:4<br>**property** [6] - 8:3, 17:19, 19:21, 33:2, 33:11, 33:18<br>**provided** [2] - 5:11, 20:3<br>**Public** [1] - 38:5 | **public** [6] - 20:13, 20:24, 22:21, 23:7, 23:16, 26:18<br>**pun** [1] - 31:22<br>**purpose** [1] - 24:8<br>**pursuant** [2] - 9:8, 9:23<br><br>**Q**<br><br>**quadrants** [1] - 14:25<br>**qualified** [1] - 36:11<br>**questions** [23] - 3:22, 5:7, 5:24, 6:3, 6:6, 6:12, 6:13, 6:18, 6:22, 7:1, 12:24, 12:25, 13:5, 13:6, 14:7, 16:7, 16:9, 16:11, 16:16, 17:9, 28:5, 37:18<br>**quorums** [2] - 20:15, 26:22<br>**quote/unquote** [1] - 26:10<br>**quotes** [5] - 10:8, 10:18, 23:23, 26:10, 26:13<br><br>**R**<br><br>**rate** [1] - 19:3<br>**rather** [1] - 34:15<br>**read** [6] - 5:7, 5:24, 9:17, 9:19, 14:15, 14:17<br>**realize** [1] - 32:3<br>**really** [2] - 6:6, 37:13<br>**Realtime** [2] - 38:4, 38:21<br>**reason** [1] - 25:20<br>**receive** [1] - 17:9<br>**recollection** [2] - 6:17, 29:8<br>**record** [1] - 22:2<br>**recordings** [2] - 27:13, 27:15<br>**records** [17] - 10:17, 11:10, 12:22, 14:10, 15:8, 15:10, 15:18, 15:25, 16:23, 19:22, 21:20, 24:2, 25:15, 26:15, 27:12, 27:13, 30:12<br>**refer** [1] - 8:7<br>**referenced** [2] - 9:14, 19:4<br>**referring** [1] - 7:8<br>**Registered** [1] - 38:20 | **reiterate** [1] - 37:9<br>**related** [15] - 10:9, 10:17, 11:23, 11:25, 12:2, 12:13, 20:20, 21:2, 23:19, 23:23, 24:12, 26:22, 27:9, 27:18, 29:11<br>**relation** [2] - 8:12, 28:3<br>**relative** [2] - 3:4, 38:14<br>**relevant** [1] - 10:24<br>**rely** [1] - 32:11<br>**remember** [11] - 4:8, 6:8, 6:16, 6:21, 6:25, 10:11, 11:1, 13:1, 17:12, 19:1, 22:17<br>**RENEE** [1] - 1:6<br>**repeat** [1] - 14:14<br>**rephrase** [1] - 31:3<br>**reporter** [2] - 9:19, 14:17<br>**Reporter** [3] - 38:5, 38:20, 38:21<br>**REPORTING** [1] - 38:17<br>**representation** [1] - 11:7<br>**represented** [1] - 28:16<br>**request** [1] - 38:10<br>**Requested** [2] - 9:19, 14:17<br>**reside** [1] - 27:24<br>**residence** [4] - 8:5, 21:9, 21:18, 21:23<br>**residency** [8] - 20:16, 20:20, 20:21, 21:2, 21:5, 21:13, 27:18, 28:12<br>**responded** [1] - 4:1<br>**responsible** [5] - 16:4, 16:25, 17:1, 17:5, 21:15<br>**Richmond** [10] - 8:3, 16:20, 17:7, 17:18, 18:9, 18:17, 18:22, 32:16, 34:3, 34:5<br>**roles** [1] - 7:21<br>**RONALD** [1] - 1:3<br>**room** [2] - 5:6, 18:9<br>**rooms** [10] - 17:18, 17:21, 17:24, 18:1, 18:11, 18:12, 18:13, 32:18, 32:20, 32:25<br>**RPR** [1] - 1:25 |

4

Jay Yerges

| | | | | |
|---|---|---|---|---|
| runs [1] - 23:20<br>Ryan [1] - 8:2<br>**S**<br>saw [1] - 5:8<br>schedules [1] - 7:20<br>school [2] - 29:17<br>schooled [1] - 26:12<br>scope [1] - 22:14<br>scopes [1] - 31:14<br>SD [4] - 24:18, 25:13, 36:15, 36:22<br>search [60] - 3:15, 4:6, 4:14, 4:20, 5:5, 5:9, 5:14, 5:20, 5:22, 7:7, 8:17, 9:13, 11:21, 13:2, 13:8, 13:17, 14:13, 14:22, 15:5, 15:10, 15:16, 15:19, 15:25, 16:12, 16:23, 17:11, 18:2, 18:5, 18:8, 18:18, 18:23, 19:4, 19:14, 19:20, 19:24, 20:4, 20:6, 20:18, 20:19, 20:23, 21:4, 21:6, 21:7, 21:11, 21:12, 21:16, 21:25, 22:1, 22:3, 25:12, 25:16, 25:19, 30:11, 30:16, 30:17, 32:18, 33:24, 34:9<br>searched [27] - 6:5, 9:7, 9:22, 13:13, 13:15, 14:1, 14:24, 15:1, 15:6, 16:13, 17:24, 18:1, 18:9, 18:13, 18:14, 18:15, 19:17, 30:10, 31:10, 31:12, 32:22, 33:5, 35:1, 36:18, 36:22, 37:4, 37:11<br>searches [2] - 28:3, 35:12<br>searching [9] - 10:14, 16:20, 17:1, 20:11, 24:8, 24:10, 26:9, 35:17, 37:1<br>seated [2] - 26:2, 27:6<br>see [1] - 31:24<br>separate [1] - 9:15<br>served [2] - 28:16, 29:16 | SERVICE [1] - 38:17<br>services [1] - 26:4<br>SERVICES [1] - 2:4<br>set [1] - 1:19<br>show [2] - 8:16, 21:18<br>silverware [1] - 25:5<br>similarly [3] - 34:2, 34:11, 35:24<br>single [2] - 21:11, 36:21<br>sit [2] - 10:11, 11:2<br>situation [1] - 17:20<br>size [1] - 36:11<br>someone [2] - 5:15, 36:7<br>sometime [1] - 11:18<br>sorry [3] - 9:20, 12:1, 13:23<br>sort [1] - 21:17<br>sought [1] - 13:8<br>spaces [1] - 22:11<br>speaker [1] - 24:15<br>SPECIAL [1] - 1:7<br>Special [18] - 8:1, 8:3, 13:23, 14:1, 14:12, 15:5, 15:15, 15:22, 16:4, 16:10, 16:17, 16:18, 17:4, 17:10, 17:14, 17:17, 19:13, 31:8<br>special [7] - 3:13, 7:25, 19:12, 27:1, 30:22, 34:4, 36:25<br>specific [3] - 13:5, 22:5, 30:20<br>specifically [2] - 7:1, 13:1<br>specified [3] - 13:7, 13:14, 13:17<br>specify [2] - 13:4, 13:12<br>ss [1] - 38:1<br>stand [1] - 31:5<br>start [1] - 9:3<br>started [2] - 8:20, 8:21<br>State [1] - 38:6<br>STATE [2] - 2:7, 38:1<br>STATES [1] - 1:1<br>States [1] - 1:18<br>statute [2] - 23:7, 23:11<br>stay [2] - 23:25, 30:2<br>staying [1] - 33:14<br>steer [1] - 23:5<br>steps [1] - 30:7<br>still [1] - 33:6 | stored [1] - 36:10<br>strand [1] - 29:3<br>strictly [1] - 11:13<br>subject [1] - 6:21<br>suggesting [1] - 35:5<br>supported [1] - 9:25<br>suppose [2] - 22:3, 27:13<br>supposed [2] - 30:15, 30:17<br>swearing [2] - 20:15, 26:19<br>sworn [3] - 3:2, 11:19, 38:12<br>synopsis [2] - 11:7, 13:19<br>**T**<br>tablet [1] - 24:19<br>tangent [1] - 29:3<br>target [2] - 15:9, 15:11<br>task [1] - 16:5<br>tax [1] - 21:19<br>team [18] - 5:9, 7:16, 7:17, 7:18, 7:22, 14:12, 15:5, 15:22, 16:18, 16:25, 18:6, 19:15, 19:16, 19:20, 25:18, 27:1, 34:13, 36:25<br>team's [1] - 15:16<br>teams [4] - 25:12, 30:10, 30:23, 31:10<br>telephones [1] - 24:19<br>ten [5] - 5:4, 5:20, 29:24, 29:25, 30:3<br>term [1] - 25:25<br>testified [1] - 16:19<br>testify [1] - 3:2<br>testimony [1] - 17:23<br>text [1] - 11:11<br>THE [5] - 1:1, 1:1, 6:11, 10:5, 14:18<br>theories [1] - 23:8<br>thereto [1] - 1:19<br>thorough [1] - 24:25<br>thoroughness [2] - 24:22, 25:8<br>three [3] - 5:9, 17:18, 31:16<br>thumb [3] - 24:19, 25:14, 36:16<br>TINA [1] - 1:6<br>TO [1] - 2:12<br>today [4] - 3:14, 10:11, 11:2, 17:12 | took [6] - 3:15, 4:18, 11:19, 12:10, 12:17, 28:5<br>towards [1] - 28:6<br>town [5] - 10:6, 10:18, 10:19, 12:8, 27:19<br>township [2] - 27:7, 27:10<br>training [3] - 17:6, 32:12, 34:7<br>trial [1] - 1:17<br>trove [1] - 35:15<br>troves [1] - 24:14<br>truth [6] - 3:2, 3:3, 38:13, 38:14<br>try [4] - 21:8, 21:13, 24:23, 30:6<br>trying [2] - 23:5, 29:7<br>turn [1] - 28:6<br>two [9] - 5:14, 9:15, 14:19, 17:19, 26:20, 27:5, 27:21, 33:14, 35:13<br>type [7] - 14:11, 15:8, 19:22, 27:11, 27:12, 32:23, 37:7<br>types [1] - 25:15<br>**U**<br>ultimately [1] - 35:16<br>under [2] - 13:8, 15:6<br>understood [1] - 32:5<br>underwear [1] - 25:4<br>Unit [1] - 22:9<br>UNITED [1] - 1:1<br>United [1] - 1:17<br>units [1] - 22:8<br>unlike [1] - 18:2<br>unusual [1] - 21:10<br>up [4] - 17:13, 30:6, 31:5, 36:24<br>utilized [2] - 12:19, 22:25<br>**V**<br>vague [2] - 6:10, 10:4<br>vehicles [2] - 18:14, 31:17<br>verbal [2] - 13:14, 14:3<br>verbatim [1] - 11:5<br>versus [2] - 26:13, 31:20<br>via [5] - 1:15, 2:3, | 2:5, 2:8, 38:8<br>videoconference [5] - 1:15, 2:3, 2:5, 2:8, 38:8<br>violation [4] - 20:14, 20:16, 26:25, 27:3<br>violations [7] - 20:14, 20:17, 25:23, 26:18, 26:19, 26:21, 27:17<br>VIRGIL [1] - 1:6<br>voted [1] - 27:19<br>votes [1] - 27:22<br>voting [4] - 20:17, 26:19, 27:17, 27:19<br>vs [1] - 1:5<br>**W**<br>walking [2] - 20:14, 26:21<br>warrant [42] - 4:14, 4:20, 5:5, 5:10, 5:20, 5:23, 6:1, 8:17, 9:13, 9:25, 10:1, 10:24, 11:9, 13:8, 13:17, 14:6, 17:11, 18:15, 19:3, 20:4, 20:18, 20:19, 20:23, 20:25, 21:2, 21:4, 21:6, 21:7, 21:11, 21:25, 22:1, 22:6, 22:14, 22:18, 22:19, 23:3, 23:4, 25:11, 28:7, 28:11, 31:14, 34:25<br>warrants [1] - 21:12<br>WASHINGTON [1] - 38:2<br>weeks [1] - 8:15<br>WESTERN [1] - 1:1<br>Western [1] - 1:18<br>wherein [1] - 1:19<br>whole [4] - 3:3, 33:4, 33:18, 38:13<br>Windorff [9] - 8:2, 8:25, 16:18, 17:4, 17:10, 17:17, 30:9, 31:9<br>Windorff's [1] - 17:15<br>WISCONSIN [3] - 1:1, 2:7, 38:1<br>Wisconsin [5] - 1:19, 2:2, 2:5, 2:7, 38:6<br>withdraw [1] - 36:9<br>WITNESS [3] - 6:11, 10:5, 14:18 |

5

Jay Yerges

witness [1] - 1:16
Wolff [21] - 7:8, 9:8, 9:23, 10:19, 11:14, 12:10, 13:2, 13:15, 17:21, 18:10, 20:12, 23:20, 24:9, 26:2, 27:5, 27:21, 27:25, 31:15, 32:19, 35:18, 35:22
WOLFF [2] - 1:3, 1:3
Wolff's [4] - 12:3, 26:15, 33:2, 34:1
Wolffs [2] - 33:12, 33:19
words [1] - 22:16
worth [1] - 37:1
written [1] - 23:11
wrote [1] - 13:9

## Y

YERGES [5] - 1:7, 1:11, 1:14, 3:1, 38:12
Yerges [1] - 3:13
yourself [1] - 23:10